All rise. Hear ye, hear ye, hear ye. The United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States and His Honorable Judge. Good afternoon. Please be seated. We're here for argument in consolidated cases 16-10654 and 21-13309, both styled Overton v. Secretary of the Department of Corrections. We have Mr. Cohen here for Mr. Overton and Ms. Campbell here for the Secretary. Mr. Cohen, whenever you're ready. Thank you, Your Honor. May it please the Court. My name is Eric Cohen and I'm here on behalf of Mr. Thomas Overton. For over 25 years, Mr. Overton has been behind bars because of unreliable DNA evidence. When presented with the opportunity to exclude that evidence from trial, Mr. Overton's trial counsel did nothing. They did not prosecute witnesses. They did not present witnesses of their own. They made no legal arguments to the court. All they did was object to the proceedings and demanded continuance based on a purported lack of discovery. But the record shows that their inability to participate at the FRI hearing was because of their inability to prepare for a critical proceeding in their client's case. In its brief, the State argues that you offered no evidence that either type of DNA testing was inadmissible under FRI. Is the State right about that? No, Your Honor. Why not? Well, there are basically reasons why the DNA evidence should not have been admitted at trial. Well, I'm focusing on evidence that it was inadmissible. Yes, Your Honor. There are three reasons why the evidence should have been excluded from trial. All right. The first is the chain of custody issues. Now, under Florida law, if there is a break in the chain of custody, then the burden then shifts to the State to explain the lack of the corroboration of the chain. Well, let's set aside the chain of custody argument for now because I'm sure we're going to get more into that later. Did you offer any evidence for why either type of DNA testing would be inadmissible? Yes, Your Honor. It comes from the scientific unreliability of the manner in which the evidence was collected, stored, and maintained in Dr. Pope's personal home and in his uncertified laboratories on which he worked on the evidence for over 600 days, nearly two years. How is that different from the chain of custody issue? It's different from the chain of custody issue, Your Honor, because if the evidence itself is not scientifically maintained, if it's not reliable, then any testing that's done on that evidence cannot meet the standards under FRI. Was there any evidence that it was adulterated in any way or damaged? Your Honor, there was testimony at the post-conviction hearing that there was minimal degradation. I believe that Dr. Pollack and Dr. Bever testified that it wasn't a lot of degradation, but there was still minimal degradation. Along those lines as well, Your Honor, we do have testimony from Dr. Pope who stated that the hot and humid conditions of his personal home could have reflected or could have contaminated the evidence. Along with that, we know that Dr. Pope worked on evidence in his personal home for many cases, not just Mr. Overton's. For example, he worked on the Allen evidence, which is the basis of our Brady claim. When he returned the evidence to the MCSO when he retired in April of 1993, the evidence was combined with evidence from other cases, all the evidence that he was working on at the time. Let me change focus just a little bit. Was there any evidence that the methods used by the FDLE or Bode, I don't know how you pronounce that, were unreliable? I would say Bode, but I'm not sure if that's accurate. Okay, Bode, were unreliable. Your Honor, there's no evidence in the record that the manner in which the tests were actually employed at either laboratory were unreliable. However, this also goes back to trial counsel's inability to go review the evidence prior to trial. It's possible they could have reviewed that evidence and used one of their two expert witnesses to determine that the testing methods were applied unreliably. The fact of the matter is we simply don't know. And that comes from trial counsel's inattentiveness and failure to prepare for the case. Well, the second, there were two types of, as I understand the record, there were two types of DNA testing done, right? That's right. With two different types of tests. That's right. One at the time was sort of a newer technology. The other one seemed to be relatively accepted, the one that was employed by the FDLE, is that right? That's correct. The RFLP by FDLE was generally accepted under the Hayes case in 1995 in the Florida Supreme Court. However, they still need to meet the second step, which is that the testing methods were reliably applied. No, no, I know. I'm not getting to that point. But in terms of the, like you have different ways that you sketch out possible attacks on the different types of DNA evidence. For example, the test that was conducted by Bode was the newer type of testing. That's right. And your argument in part is that that sort of testing was not scientifically accepted, at least not universally so at the time. But you don't make that argument with regards to the FDLE test, right? That's correct. At least at the time, Florida, no court in Florida, to our knowledge, had said that the STR testing conducted by Bode was generally accepted. I understand the state cites a number of cases from outside of Florida that had found separately about the STR testing. But at least in Florida, the STR testing had not been generally accepted at the time, at least not by Florida. What definition should we make of trial counsel's testimony at the evidentiary hearing that Dr. Littman believed the science behind both methods of DNA testing was sound? Well, even if the science behind both testings is sound, we still need to talk about how they were applied to this case, Your Honor. And so even if the science behind the testing is correct, there still needs to be a case-by-case application. That comes directly from the Hayes case. Yeah, so you keep going to that, and I guess I don't really understand that argument. How does the chain of custody issue, which seems to be what you're pointing at there, how does that have anything to do with the reliability or the generally accepted nature of the testing? Well, Your Honor, I think both arguments go to the same point. There's the chain of custody issue, which is—and the reason for chain of custody, as we know, is to make sure that the evidence that was collected from the scene is the same as the evidence that's— Right. Right? So that's one issue. The other issue is the possible scientific unreliability of the evidence, and that comes from working on the evidence in someone's own home, an uncontrolled environment. Yeah, and so how does that—I guess that's what I'm trying to figure out. I mean, if this were a case where the DNA was contaminated or it was spoiled or there wasn't an ability to get a sample from what was collected, I would get your argument, but it wasn't that, right? The experts were able to test the DNA. They were able to determine that it was your client's DNA. So how does that matter? Well, we were able to test it, Your Honor, but I would go back to a really important point that unfortunately didn't make it into our brief, so I want to make sure that I give you citations here. When the FDLE tested with the RFLP testing, they only found DNA from two of the clippings that were sent to the laboratory. That's DE13-128 at 73. However, when Bode tested the clippings, they were only able to find DNA on one of the clippings, and that's from DE13-69 at 21. And so that just goes to show, Your Honor, even though there was little degradation in the evidence according to the experts, and even though they were able to extract some DNA, there is still a discrepancy on the DNA testing results themselves. And this goes back to the scientific unreliability of the evidence. We simply just cannot say with certainty that the scientific reliability of the evidence can be used to convict somebody for a capital punishment crime. I just want to press on that a little bit because I still really just don't understand how that connects. So is there any evidence in the record that you could test a DNA sample that was not contaminated and it turned out to be wrong and you identify somebody else, for example? I'm not aware of any. Okay. Yeah, I don't think that happens, right? So either the DNA is contaminated where you can't test it, or it's not, and you can test it, right? It's binary. Well, you can simply test it either way. It could draw some aid or not be inclusive of the results. Yeah, and here it wasn't inconclusive. So that's why I guess I just don't understand. Let me ask this a different way. So the Florida Supreme Court said that even if the chain of custody was broken, I'm quoting, even if the chain of custody was broken, there was not sufficient evidence to establish a probability of tampering which would support exclusion of the evidence, end quote. That seems like a state law evidentiary ruling that they're making there. Don't we have to just accept that at face value? Well, it's an unreasonable determination of facts, Your Honor, and we would argue that that's an unreasonable determination of the facts. In what respect? Well, Your Honor, our reply brief documents at least six different ways in which the chain of custody was broken. That's what they say. They say even if the chain of custody was broken. Yes, Your Honor. I still think that's an unreasonable determination of the facts because once we show that there is a broken chain of custody, then the burden shifts to the state to show why those breaks in the chain of custody renders the evidence still reliable. That's from the Murray case which we cite in our brief. It's also from Dodd which is cited in Murray. And at that point, the burden shifts back to the state, and they have to show why the evidence is still reliable in that situation. The facts in Murray, Your Honor, I think actually play appropriately. Those are state of Florida cases? Okay. What do we do about the fact that the state of Florida has said in this specific case that without evidence of probability of tampering, then you don't exclude the evidence? Your Honor, I would say that's an unreasonable determination of the facts. Of state law? Yes, Your Honor. Okay. That's not something that I'm aware that you can argue about in federal habeas. No, I understand that, Your Honor. But the reason that that determination is unreasonable is it goes back to the fact that they weren't accepting the evidence that was brought forth in the post-conviction hearing showing that there were multiple instances in which the break of the chain of custody soiled the evidence essentially. Your argument is that the break in a chain of custody can be so bad that in and of itself it can render evidence inadmissible? Yes, Your Honor. It renders the evidence. The evidence should be excluded. That comes from Florida state law. That's both Murray and Dodd. Is that a per se rule in Florida law with regards to the effect of a chain of custody break? Well, it's a per se approach, Your Honor. So if there's a break in the chain of custody, then it shifts over to the state to explain why the evidence should still be accepted. Well, I mean, isn't there an explanation? I mean, I'm just—I mean, the explanation is we test the DNA and it's testable and, you know, that's the explanation. Well, Your Honor, if that's the explanation, then we should just send everything over to the DNA testing laboratory. If they're able to test it and find DNA, then that means we should accept it. And that's really a fundamental problem with the state's argument in this case, is they're saying that as long as you can get a positive DNA reading from evidence, then constitutional protections, such as ineffective assistance of counsel and Brady, shouldn't apply. And that's not— Well, they're not saying it doesn't apply. They're saying there's no ineffective assistance and there's no Brady violation. No, they're talking about a prejudice in materiality, Your Honor, which is that there wouldn't have been a difference, so there's no reason to have a lack of confidence in the verdict, which is the same standard applies both to materiality and a prejudice in that instance. Well, I think with respect to—let me just ask you to follow up on something that Judge Pryor mentioned that I feel like was dropped a little bit. So when counsel were questioned in post-conviction review, they said that they didn't participate in the Frye hearing more fully because they wanted to preserve their continuance issue for purposes of appeal. I think, I mean, I think you'd agree that's a strategic decision, right? So you said it was a strategic decision, and I'm not necessarily— Okay, let's fight about it. You don't think it was a strategic decision? No, no, no. Okay, in what way was it not strategic? First— It needs to be strategic. There needs to be some sort of long-term benefit. There needs to be, even in this moment, Your Honor, if this wasn't part of our strategy. In the long term, you can understand why this is strategic, even in this moment. And so here, what they're saying is in this moment, the fact that we didn't participate in the Frye hearing where it was a DNA case, you know, the only physical evidence offered against our client. If, even though we're not participating here, in the long term, it's going to make sense because we're going to be able to appeal this discovery issue. But the fact of the matter is they then went to trial, and they cross-examined these experts. They cross-examined Dr. Pope. They cross-examined Detective Petrick. And the reason they said they didn't want to participate in the Frye hearing was to preserve their arguments and say, well, we weren't able to participate. We weren't able to participate fully because of the lack of discovery. They didn't want the public to say, well, you just didn't stop. You were able to at least get some of it down. But then they went ahead and did it in trial anyway. That doesn't really make a lot of sense, Your Honor, in terms of long-term strategy. The stronger argument, it seems to me, about whether or not that decision was strategic or not or whether it was reasonable is that I've read a good chunk of the testimony. The lawyers were put into that proverbial corner because of their malfeasance in not investigating and doing almost anything. I mean, when in the world do you see a state judge or a federal judge, for that matter, write a memorandum to the file, RE, Ineffective Assistance of Counsel? They had years to do something on the DNA, and they were just completely unprepared. So, yeah, at that point, they're sort of backed into a corner, and they figure they'll take a continuance issue and try to preserve it for appeal, but that's only because they were woefully unprepared. So I'm sympathetic with your argument about the performance aspect of your claim, even under epidefference. This is really a rare case in which I can't understand how the lawyers did or failed to do what they did. The issue for me, though, is the prejudice prong. And let me ask you to turn, because you make a – this is the way I understand your brief, that you make a prejudice argument that is not wholly but in part derived from the prejudice resulting from the ineffective assistance of trial counsel and also the Brady violation you claim relating to Dr. Polk's errors, alleged errors in the other case, right? That's right. Okay. So let me turn you to that second aspect of it. I've looked, my law clerk has looked, and maybe we just haven't been able to find it. Maybe you can help us, and I'll ask Ms. Campbell, too. Is there anything in the record or in reported cases or docket sheets that tell us the timing issues with regards to when, in the other case, Dr. Polk's efforts were thrown out and excluded in relation to Mr. Overton's trial and appeal? I know from the briefs that the two murders and the two investigations were running at roughly parallel times, but there's nothing in either of the briefs about the timing sequence. If Dr. Polk's work in the other case was excluded and thrown out because of his mistakes or methods or whatever after Mr. Overton's trial, the Brady obligation to disclose would have been triggered after the trial, right? Yes, sir. Okay. So that's what I'm trying to find out. When did that event occur, and where can I find that date in the record? Well, Your Honor, I don't have the record site in front of me right now, but I believe it should be cited in both of our briefs. And just to clarify, the evidence wasn't excluded at trial. The evidence was rejected by the FDLE State Laboratory. They said, we're not even going to test this evidence because of the scientific unreliability of the evidence. They said it was contained. He pulled hairs from different spots. He should have pulled hairs from one spot, right? He mixed the hairs together. The hairs from two different spots were in the same envelope, or at least the envelope reflected that there were two hairs from two different spots. We're not exactly sure, but either way, the result is the same. The laboratory didn't test it, and that was in June of 1992 that that happened. Okay. And so well before Mr. Overton was even charged with this crime, let alone taken to trial. And so it absolutely should have been disclosed. Here's the question I have about that, because I don't understand that argument either. So in that case, he didn't preserve the, you know, I don't really know how you would couch it, preserve it, collect it, something. He messed up. And so they didn't test it because they said, look, it's going to be contaminated. It's not going to come back with any useful results. In this case, it wasn't contaminated, and it did come back with useful results. I really don't see the connection between the mistake he made there and how it really helps you here. Could you just explain that? So if you were to take the hairs that were put in the same envelope and sent to the laboratory, the laboratory surely could have tested those hairs, and they could have found, okay, there are five hairs in here. One of them belongs to the victim. Four of them belong to some other people. Maybe it matches a suspect. Three of them belong to the victim. Two of them, et cetera. They could have still come to that conclusion and reported those results. The thing is that they didn't because they knew from the front end, we cannot confirm the reliability of these objects, of this evidence, and the manner in which it was collected, preserved, labeled, and sent to the laboratory. And that links in with your partial argument that the technician, I think it was a technician in QS who received the materials, the strips from Dr. Pope, got them in a non-sealed manner. That's correct. And then he or she, I forget it was a man or a woman, but then undertook to seal them himself or herself because of the knowledge that FDLE would not accept non-sealed exhibits and then sent them in a sealed container or package so that FDLE thought these were sealed materials and then conducted the testing. That's correct, Your Honor. And so that's the way it relates to this case, Your Honor, is that even though here they were able to test the DNA and they were able to get results, there's a foundational problem with the way that the evidence was collected and stored and then sent to the laboratory. And there's no evidence in the record that either laboratory, the FDLE or Bode Tech, was made aware of these issues with the chain of custody, was made aware that Dr. Pope stores evidence at his own personal home in the Keys prior to testing the evidence. In fact, we have Dr. James Pollack testifying at trial that he assumed that evidence was handled correctly. And the reason was because he was able to get a positive DNA match from it. And so it's basically circular reasoning, Your Honor. If I'm able to get a positive result, it means the evidence must have been collected in a reliable way. That's not necessarily how it should work in this situation. The Hayes case and Brim, also, Your Honor, from Florida, states that the evidence needs to be collected properly. And if the evidence is not collected properly, then the evidence shouldn't be admitted at trial. And that's really the big issue. But the Supreme Court of Florida said the opposite here. I guess that's what I'm, I mean, in this case, the Supreme Court of Florida said, even if the chain of custody was a problem, it was still admissible. But that only evaluates the chain of custody issues, Your Honor. It doesn't evaluate the scientific reliability of the evidence, which we see as two different tandems into getting the evidence excluded. And that's what goes back to our prejudice argument, Your Honor, is that because counsel did not, was inattentive to the case, was inattentive to the standards prevailing, the collection of DNA and testing of DNA at the time, they didn't understand that they were able to bring that challenge prior to trial and really should have brought that challenge prior to trial. In fact, there's no evidence that they even brought that challenge during trial. Surely they cross-examined Dr. Pope, they cross-examined Detective Petrick, they cross-examined both of the technicians from the laboratories, but they never actually made to the judge, this evidence is scientifically unreliable and under Fry it shouldn't be admitted. That's really what the issue comes back to. I have in my notes something that Judge Pryor raised earlier that I want to get your response to. I have in my notes that the defense expert, Dr. Littman, told the lawyers that the science behind STR was sound and that this chain of custody issue would not matter. What do you say about that? Am I wrong about that being in the record? Well, those are two separate issues, Your Honor. The science behind STR, that is sound, correct. But again, we get to the application of STR testing to this case. And if there's no proper chain of custody, no scientific reliability of the evidence, then you're not going to get a good result. Well, what did Dr. Littman say to the counsel? Am I right that he said that this chain of custody issue wouldn't matter? Your Honor, I see you're out of time. If I can answer the question. Of course. Thank you. Your Honor, yes, Dr. Littman did tell counsel that STR testing was sound and unlikely would have been accepted. Okay. Was Dr. Littman aware of the chain of custody problem or the extent of the problem when he made this statement to them or gave them this advice? Well, he was part of the trial prep team, so I imagine they were going to make a tampering claim, the claim that Mr. Overton's DNA was planted. That's the defense that they raised at trial. So I imagine he probably was aware of their chain of custody arguments, Your Honor. All right. Thank you very much. Thank you, Your Honor. Ms. Campbell. May it please the Court, Leslie Campbell with the Attorney General's Office on behalf of the state. With respect to the tampering claim, the chain of custody and tampering, we have seen absolutely no evidence of any tampering of the evidence, any planting of the evidence in this double homicide where Dr. Pope processed the scene the day of the murder or the day after the murders and identified areas on the sheet where Missy MacGyver was found. He documented where those scene stains were. He took the evidence back to his lab. He made cuttings a few weeks later, and he had no evidence of semen or blood from Mr. Overton. So the question of the admissibility of this evidence... I don't understand what you mean by that, that he had no... He did not have Mr. Overton's semen, nor did he have Mr. Overton's blood. You mean at the time he collected the sample? Well, he did because it was on the sheets, but you're saying other than that it was on the sheets. Correct. So it was on the sheets. It was deposited there at the time of the murders. The problem, and it may not affect the ultimate outcome of this case, I speak only for myself, Ms. Campbell, is that it's almost unbelievable that this evidence was processed this way in a double homicide. It just boggles the mind. Mr. Pope did what he testified that he did. And I know, and I'm not blaming you for that. I'm just expressing a view that you don't get stuff like this happening. It's just you look at it and you're like, no, that can't be. Somebody's just not saying the truth. And then you look and you're like, yeah, that really did happen. Well, Mr. Pope was cross-examined thoroughly on his techniques and on his processing of the crime scene and how he stored it. And the Florida Supreme Court made a finding that there was no break in the chain of custody. That's got to be wrong. It is, Your Honor. Tell me how. Because everything went through and it was documented as it was supposed to be. Yes, some items were taken home. Yes, some items were stored in the lab and others were stored in a reserve. And some people who signed some of the forms were not the people who signed the forms. That was explained, Your Honor. Dr. Pope put the name of Mr. Petrick on the bag. That was explained. The jury understood that. The Florida Supreme Court understood that. So where there were some challenges, yes, everyone was aware of those challenges. But the most important factor is, it's Mr. Overton's DNA on the fitted sheet where the victim who had been raped, an eight-month pregnant woman, was raped and then killed. And her baby then died as a result of that. It was Mr. Overton's DNA on that sheet. And there is no evidence, absolutely no evidence of planting. Mr. Overton is given a story that his girlfriend had kept a condom for months and gave it to Detective Visco. Detective Visco testified he never received that item and he was not in the crime scene. He did not enter the house that day. Therefore, any chain of custody issues is thwarted by the fact that there is absolutely no evidence of tampering. And the Florida Supreme Court found that. And that is a reasonable, well-supported, factual finding by the state court that this court has no evidence, is unreliable. Why do you think the trial lawyer's decision not to participate in the Fry hearing is a valid strategic decision? It is a valid strategic decision, Your Honor, for this reason. Their whole case was based on planting of evidence. They had, and I disagree that they didn't do any work in preparation for a Fry hearing. They were woefully unprepared. They admitted as much. They admitted as much, but They asked for a Fry hearing and then they told the judge they weren't ready. Yes, they made a strategic decision, two strategic decisions. One, they asked for the Fry hearing, but they had their own expert, Dr. Littman, who was saying the science, and that's the issue at a Fry hearing, is the science, not the collection techniques, not the storage techniques, but the science. The science of both RFLP and STR are sound science. Why would they have asked for a Fry hearing then? Because they were challenging the STR. Of course. I understand that, Your Honor. But they were told it was sound science, so they had to make a decision. But they were told about that before they asked for the Fry hearing. Yes, they were. And they asked for a Fry hearing. Then maybe it was a strategic reason to get a continuance. Then that's not really strategic. That's just like, I got nothing left, and let me just throw up whatever I can against the wall. You can call anything a lawyer does strategic, but that's not a valid strategic decision. They were woefully unprepared. I disagree, Your Honor. They knew from their expert the science. And in any case, Didn't the lawyers say at the hearing, the trial lawyers say at the hearing, I think it was Mr. Smith, that the reason that they didn't participate was not the reason you say, but to try to preserve the continuance issue and the discovery issue for appeal. That is one of the reasons. And that issue was nonexistent because then when the case goes to trial, they cross-examine. Because by then, they've gotten up to speed, and they have the information they need to do whatever they think they need to do. And so, you know what? There's no issue on appeal concerning the continuance or the lack of discovery. The fact that they wanted a continuance, the continuance was based on that they wanted additional evidence from Bode Labs as far as their accreditation and how they processed DNA. Whether or not the STR is excluded during the Frey hearing is really of no moment because the RFLP was coming in regardless. Right. That goes to whether or not there's prejudice under Strickland, but it doesn't go to whether or not the lawyers rendered deficient performance. I just can't understand how you can label the failure to participate a valid strategic decision when that decision was born out of lack of preparation. You have to have a reasonable investigation to be able to make a strategic decision. The Supreme Court has said that over and over again. Yes, and they had their expert, and they made the decision not to go up to Bode Labs to look at this voluminous information. Correct, and then ask for a Frey hearing. That's why you and I may just disagree about the performance. Let me just, I mean, with the Frey hearing, they were requiring the government to establish that the testimony was admissible, right? That's correct. So, I mean, I don't know why a person in Florida at this time period would ask for a Frey hearing even if their expert told them it's going to be admissible anyway. But, I mean, it seems to me if I were a criminal defendant, I would want the government to put on its burden and meet all of its burdens. And so maybe one reason you might ask for a Frey hearing, even if your own expert told you it was not going to go anywhere, is just to make the government do its job. What about that? That is reasonable. And so what exactly did Dr. Lipman tell them? I mean, I have in my notes that Dr. Lipman told them, one, the science behind Str was sound, you know, he couldn't say otherwise. And two, that this chain of custody issue wasn't going to matter one way or the other. Is that correct? That's my recollection of the facts. Okay. At some point he did testify that degraded DNA could give you a false positive, but he could not come up with any cases where it actually happened or any case law where that actually happened. And I also write that the State Supreme Court said that even if there was this chain of custody problem, the evidence was going to come in anyway. That's correct because there was no evidence, absolutely not a scintilla of evidence of tampering. Can we shift over to the, if you're not done with the ineffectiveness issue, you can certainly continue. I don't want to interrupt you. I think I've covered enough unless the Court has any other questions. Okay. On the chain of custody. Then if you could, if you could switch over to the Brady issue. And is Mr. Cohen right that whatever it was that happened with Dr. Voti, I mean, Dr. Pope, that the other case took place sometime in 92? Is that right? The evidence was collected in November of 91. It would be the FDLE report that came back, and I don't remember. When you say the evidence was collected, which case is evidence are you talking about? In the Allen case. Okay, that's right. In the Allen case. This case, the evidence was collected in 91. Yes, 91. And the evidence in Allen was collected in November of 91. So your Honor is correct. It was kind of happening at the same time. The question is when did FDLE send the report on the evidence that it was looking at, it was testing in the Allen case. And I'm sorry, I can't remember the exact date. But the fact is the state courts, both the trial and the Florida Supreme Court, found that the defense did not identify the date that this mixing of salmon hairs and hairs from the body of the victim was done. I mean, just on a very minute factual point, it doesn't matter when that was done. What really matters is when the FDLE report came back saying we're not going to test this because we think you haven't done the protocol the right way and you might have done this wrong and et cetera, et cetera. Was there any dispute about that, about when that FDLE report was submitted? No, there should not be a dispute about that. Okay. However, the Florida Supreme Court determined that there was no prejudice. And the reason for it is, as Your Honor has recognized, Dr. Pope made several collection errors during the processing of this case. However, with regard to the evidence on the sheets that he collected, he identified it at the crime scene. He collected it shortly thereafter, early September. He stored it in such a way that it was not contaminated, it was not degraded. He left the office in 1993, and it wasn't until 1994 that FDLE developed a profile. And then it wasn't until 1996 that Mr. Overton either attempted suicide or cut himself in such a way that he could get himself to a hospital and a possible escape route, which he had done previously, that his DNA, in the form of blood now, not semen, but blood, was collected, processed by FDLE, and brought to Bode Labs. And it was determined that the DNA, the semen DNA, was not degraded and they could get a profile under RFLP that came back the five loci to Mr. Overton, and that was one in six billion Caucasians. And then Bode, on 12 loci, matched Mr. Overton's semen to the blood DNA, and it came back on all 12, and that's a one in four trillion match or chance. Mr. Overton, in his brief, argues in part that had the state disclosed what happened in the Allen case with regard to Dr. Pope's submission of the hair samples, that that likely would have resulted in exclusion of the DNA evidence here. Tell me why you think that's wrong. That's wrong because an error in one case doesn't create an error in another case. At most, if the jury were made aware of it, it would just be another example of Dr. Pope's less than stellar collection techniques. It certainly wouldn't put Mr. Overton's case in such a different posture that there would be a different result. It still is his DNA at the crime scene, and his DNA was matched to his blood five years later. How many—remind me, this part of the record I haven't read or don't recall, how many—I think Dr. Pope cut ten strips from the bedding materials at the scene and then cut them again so there were 20 strips, right? I will go with your— And he sent half of them to Bode, and then half of them were ultimately— not he, but half of them were sent to Bode, half of them were sent to, at some point, to FDLE. Is that right? At the point where they were going to Bode, there were ten strips left, and the defense had the state hold back five of them. Five went to Bode, and five were still left in evidence should the defense want to do additional DNA testing. Right, but that's what I'm trying to figure out in terms of what actually happened. Testing was done before Mr. Overton cut himself, right? That's correct. Who did that initial testing to get some sort of result, even though they couldn't match it to anybody at the time? FDLE's policy at the early part of this case was that they wouldn't do DNA testing unless there was a suspect.  So in 93-94, they did testing because they had several people they wanted to eliminate. And so the initial testing and the initial creation of the autorads by FDLE was done in 94. So Bode was not involved at that initial testing stage? It was not involved until 97, I believe. Got it. Okay. So whatever problems Dr. Pope created in how he handled the evidence, it still doesn't rise to the level of exclusion of evidence because there is absolutely no evidence of tampering. Again, the defendant's DNA is at the scene in the form of semen. There is no evidence showing anybody else in that crime scene had Mr. Overton seen. We have findings of the Florida Supreme Court on direct appeal and on the post-conviction appeal that find that this evidence is admissible, RFLP is admissible, and SGR DNA science is admissible and accepted, generally accepted scientific processing of DNA evidence. Were there any, were there any, there were some courts I think outside of Florida that had opined on the reliability of the SRT testing at the time, right? Yes. And had all those decisions gone the same way and said that it was a reliable method of testing for DNA in your recollection? I can't recall of a court that said it doesn't come in. The science itself is reliable. There may have been challenges based on questioning whether using DNA, which is such a strong evidentiary tool, to use DNA from a crime scene. I mean, they went, some of the courts went so far as to say, well, it's a, you know, contaminated crime scene. But that's the nature of DNA. That's the nature of forensics. You're going to have evidence collected at the crime scene. And what the testing shows thereafter is either reliable because it is unadulterated, it's not, it hasn't been degraded, they can get good results. Versus if it is degraded, whether it came from a crime scene or someplace else, that's a jury decision. Yeah, I mean, it seems to me like, I mean, I had the same feeling, I think, that Judge Jordan had when I looked at the collection efforts here, is this is just kind of crazy that somebody treated a double murder this way, triple murder this way. But the kind of way I understood it is the state sort of lucked out that this wasn't contaminated and it wasn't adulterated and that you could get a match. That was kind of my read on it. Do you have a comment on that? Or Dr. Pope just did a good job of collecting the semen stains and the sheet, the bedding material, and he did process that properly. Yeah, I mean, to me the difference between this case and the other case where Dr. Pope, you know, his collection efforts were problematic, is that in that case the state didn't have the benefit of the evidence because his collection efforts were not good. And here they do have evidence. But even in Allen, while FDLE did not test the hairs that had been missed, they did test the other evidence that Dr. Pope submitted. So it wasn't that FDLE doesn't or didn't test Dr. Pope's collection of evidence. Yeah, here the analogy would be if he had taken, like, evidence from the crime scene and evidence from, like, outside the house and mixed them together in the same bag, that would be the equivalent. And then they would say, well, there's just nothing here. We can't even test that DNA. But fortunately, that's not what happened, and you have a DNA test and you have a match. And we have the findings of the Florida Supreme Court, which aren't given balance. Could you address the continuance issue, just to go back to the first, the ineffective assistance of counsel claim? Because it did strike me that that was a strategic decision and that it made some sense, which was, one, they asked for the FRI hearing, they make the government prove its case and prove that this evidence is admissible. But their expert says this is not going to work, you know, the government is going to meet its case. And so they kind of, like, say, okay, we're not going to participate to preserve this continuance argument. I mean, why isn't that a reasonable decision? And even if it's not a reasonable decision, it's not so unreasonable that we could say the state court's reasonableness determination is itself unreasonable? Not only did they make the state test their case, but they also preserved an issue for appeal, and they knew that the RFLP was going to come in anyhow, so they have preserved their defense of trial. Their defense of trial, again, was tampering. So it was a strategic decision in that they had an expert, they investigated, they didn't have this one little piece of evidence of how the Bode Labs was accredited and how they conducted the testing. However, on the post-conviction relief motion, that was all brought up again. And so we know for a fact that the accreditation and other aspects that might have been challenged at the Frey hearing were investigated, and there's no problem with the STR. The Florida Supreme Court found that both RFLP and STR are generally accepted and admissible at trial. But proceeding on the merits with and engaging in the Frey hearing, that wouldn't have affected their ability to put on their trial defense of sabotage and alteration and improper deposit of the semen samples and all of that. They still had that issue, yes. Right, but I'm saying participating in the hearing wouldn't have given up that issue for them at trial. You could have proceeded on parallel tracks, which is, you know, one expert is better than two for us on the defense side, and it's better to just have one set of experts provide testimony about DNA testing with one methodology than to have two experts testify and come up with the same result under two methods. That's much more credible for a jury. And yet there's still absolutely no evidence that had they challenged, actually had evidence and challenged it at that time, that STR would have been excluded during the Frey hearing. If there are no other questions, I ask this Court to affirm the denial of the habeas. Thank you. Okay, thank you very much, Ms. Campbell. Mr. Coleman. Thank you, Your Honor, and may it please the Court once again. I want to address a couple of comments that were made by my colleague during her argument. The first is that, quote, no serological evidence in Dr. Pope's possession belonged to Mr. Overton prior to Dr. Pope's work on this McIver case. That's actually wrong based on the record. We know from the post-conviction hearing that Mr. Overton was a suspect in the disappearance of another person in the Florida Keys prior to the McIvers. And in connection with that case, there is a report that states that the MCSO had Mr. Overton's serological evidence at the time. This is on the record at DE 13-293, 31-32, the cross-examination of Detective Visco at the post-conviction hearing. Where did they get his semen? The theory is that they got his semen from his ex-girlfriend. No, no, no, I'm sorry. That's your tampering theory. I'm saying when you're saying they had his serological evidence, you mean they had his semen before this murder happened? We don't know exactly what's going on. All we know is that there was a serological report that indicated that they had Mr. Overton's evidence. It's not specific as to whether it's blood, semen. But the theory is that, yes, that he was able to obtain it from Mr. Overton's ex-girlfriend with the idea of trying to test some evidence to see if it would have connected with any evidence that they had in connection with this direct case. So they did actually have his serological evidence prior to investigating the McIver case. And then we get to the time of the crime. We know that Dr. Pope collects the evidence at the scene. We know that he bags the evidence. We know that he seals the evidence. And we know that he signs Detective Petrick's name. He puts the evidence in the MCSO car. And then when he picks up the evidence, either the next day or the day after, the seals are broken. And we know that Detective Visco is present at the scene that night. Now, he says he never goes in. But we know that he's present at that scene that night. So he knows what's being collected. And so there we have the break in the chain of custody mattering in terms when it comes to the tampering claim. And so I just wanted to make sure. Detective Visco was at the scene of the crime or at the scene of the breaking of the seals? He was at the scene of the investigation, Your Honor, at the McIver house that night. Yeah. One thing that is confusing to me about – and I don't think you have to kind of relitigate the tampering claim, really. But, I mean, one thing that's confusing to me about it is if your theory is that this detective planted this semen in 1991 to frame someone else, why would the case go unsolved and, you know, they never targeted Overton or anything like that until they kind of randomly got a match for him, you know, five years later? I mean, it doesn't make any sense. Well, the simple answer is that they just simply didn't have any more of his serological DNA. The DNA that they had was put on the bed sheet and they just didn't have any more evidence to test it against and make a match. It was only after they recovered his blood from when he was arrested on a separate issue in 1996 that they were able to make a match. No, I guess what I'm saying, why would a police officer who wanted to plant evidence to make sure someone else goes to jail plant the evidence and basically commit a very serious crime and then just do nothing for five years and just hope that maybe at some point that guy will get in trouble and then they can do a match? It just doesn't make any sense to me. Well, he – I'm not saying – you don't have to relitigate the tampering thing. It just seems kind of implausible that that would – I mean, if I were trying to frame someone, I wouldn't like sort of frame them a little bit and then like sit back and wait, you know, like half a decade to just see if maybe they randomly get caught for another crime and randomly their DNA is tested. I simply know you're not trying to frame anyone. I've thought about it, but, you know, I've reframed. I will say, Your Honor, that Detective Visco knows Mr. Overton very well. And the reason he knows him very well is because Detective Visco, along with the rest of the MCSO, has had multiple run-ins with Mr. Overton through the years. And this is well documented in the post-conviction hearing, the testimony of every single MCSO officer that testified there testified to this fact. And so from Detective Visco's perspective or from someone at the MCSO's perspective, they figured, well, at some point we're going to run into him again. We're going to arrest him on something. We're going to be able to get his DNA in due time. So that would be my answer to that question. At first, that theory seemed crazy to me too, and I still think it was. But it seemed a little bit less crazy if you believed what you just related, that Detective Visco knew that his serological evidence was already available. And the thought was they're going to run it against whatever they have on file. And if they have his on file, they're going to hit a match at some point. Otherwise, the theory is completely ludicrous. But if Detective Visco knew from his run-ins and his work with the Monroe County Sheriff's Office that the office had his seriological information and data, then you could see maybe an expectation. You have to believe the tampering side, of course, but you could see how there might be an expectation that at some point once the semen from the crime scene was tested, it would ultimately hit a match with whatever they had on file, including Mr. Overton's. That's the way I understood the theory, which made it a little bit less crazy. Yes. Agreed, Your Honor. I completely understand when you hear theories like this. And I'm sure a lot of defendants across this country, when they come up with a positive DNA match, have made the same sort of excuse. Oh, it must have been planted there. I have no idea how it got there. But when you start to peel back the layers of this case, which is what happened at the post-conviction hearing, you really do see that there was a lot of animosity between the MCSO and Mr. Overton. And a lot of that comes back to the fact that they believe that Mr. Overton was responsible for this separate crime that he simply just wasn't responsible for. And so they figured, well, we can take out two birds with one stone. We can solve this crime that has gone unsolved for many years. Well, no, that doesn't make any sense, because they would have had to plan it way before. So that's what I'm saying. That makes no sense. What I mean is we can solve this crime of many years, this Eret case, the other case. Oh, okay. We can solve this crime and the McIver crime at the same time. And we can get the guy that we know was responsible according to them. We know was responsible. Let's talk about something that actually there is evidence for. So at the post-conviction proceeding, and this goes to the ineffective assistance of counsel claim and whether it was a strategic decision. So the counsel was asked questions about why they decided to do what they decided to do. And they said, I mean, I'll just read you what they said in response to why they didn't fully investigate and participate in the FRI hearing. Counsel said, I mean, that was a concern to spend that amount of time when it could be better spent in preparing other areas for trial as to that point in time. Plus, you know, that added fact that we felt we could make an issue of appeal on that because we felt we weren't given adequate discovery, and that it shouldn't have been either or that we, well, we weren't given the discovery and we would have to go up and spend a week, you know, with the trial coming up. So that's the quote from them. So it seems like what they're saying there is, look, we asked for this FRI hearing. We knew it wasn't going to go anywhere. And we just didn't – we had this appellate issue that we wanted to preserve. And we just don't want to spend the time preparing for the FRI hearing when we didn't think it was going to go anywhere and we'd rather preserve the appellate issue. Why isn't that a strategic decision? And if it is, why isn't it reasonable? Well, it's certainly not reasonable, Your Honor, but I'll start with why it's not strategic. And it's because when you – Well, let's just start with why it's not reasonable because it's pretty clearly strategic. Fair enough, Your Honor. The reason it's not reasonable is because this evidence was available for them for a long period of time. The FDLE testing evidence was available at least back to 1993 when they first obtained the evidence. And then in terms of the match, it's available since 96, BODETEC in 97 and 98. That's for a long time. So when you isolate it down to just the month, two months before trial, along the time when they requested and had the FRI hearing, then sure, I can understand why they might think we don't have time to go up there and do this. But there were multiple years and multiple continuances, and they just decided not to go do it. That certainly cannot be a reasonable decision under these circumstances. This almost exactly matches the facts of the Wiggins case that SCOTUS decided in 2003, the United States Supreme Court, where the attorney there decided not to review reports from Social Services Department showing the background of his client and how it could have been presented as mitigating evidence. He simply decided to only review summaries and didn't actually review the whole report. And he tried to testify, well, I didn't have time. I needed to make sure I put on mitigating. I needed to prepare for trial because sentencing and trial were at the same time. And the U.S. Supreme Court said, no, that comes from your inattentiveness. That's why you think it's reasonable because in that moment, sure, you didn't have enough time. But that's because you simply didn't spend the time beforehand. Okay. Now, I just want to make a quick moment on timeliness. The state has waived the timeliness issues in this case, and because this is a non-jurisdictional statute of limitations, that waiver of timeliness should be accepted. And so, therefore, we submit that the three questions that are to this court about timeliness should be answered in Mr. Robertson's favor. Your Honor, if there are no further questions, I'll just wrap up by saying that what the state advances in this case is that as long as there is a positive DNA match, then there can be no prejudice under any prong of any, whether it's ineffective assistance of counsel or under Brady. And that's simply not the law in this country. Constitutional protections apply to every single defendant, regardless of whether there is a DNA match. And I ask that this court reverse the district court and remand with instructions to grant Mr. Overton's petition and vacate his verdict. On behalf of Mr. Overton, thank you for your attention to this case. All right, Mr. Cohen. Thank you very much. Ms. Campbell, thank you very much. We appreciate the help. We're in recess. All rise.